UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **UNITED STATES** | **CRIMINAL ACTION** |
| v. | NO.: 3:17-CR-00155-L |
| **MICHAEL TABA (7)** | |

**MICHAEL TABA'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR A JUDGMENT OF ACQUITTAL (R. 29) AND MOTION NEW TRIAL (R. 33)**

 

Sara A. Johnson
Sara A. Johnson, Attorney at Law, LLC
Texas Bar No. 24117874
700 Camp Street
New Orleans, LA 70130
(504) 528-9500
sara@sarajohnsonlaw.com

Counsel for Michael Taba

# TABLE OF CONTENTS

I. THERE IS INSUFFICIENT EVIDENCE TO SUSTAIN THE CONVICTIONS. ................. 1

   A. To prove that Dr. Taba intended to cheat DOL, Dr. Taba must have submitted a claim for payment to DOL or received money from DOL. He did not. ............................................ 1

   B. To prove that Dr. Taba intended to deceive DOL, Dr. Taba must have made a misrepresentation to DOL. He did not. ............................................................................... 2

II. JURY INSTRUCTION ERRORS. ................................................................................... 5

   A. The intent to defraud and scheme to defraud instructions were disjunctive. .................... 5

   B. Dr. Taba's good faith defense was not presented to the jury. ............................................ 6

III. RECESS AND SEVERANCE. ......................................................................................... 7

   A. The delay warranted a mistrial. .......................................................................................... 7

   B. The mid-trial severance of Noryian specifically prejudiced Dr. Taba and a mistrial should have been declared as to him, too. ...................................................................................... 8

IV. THE DISMISSAL OF MOFID AND L. NOURIAN WAS NOT SIMPLY A MATTER OF PROSECUTORIAL DISCRETION. ............................................................................ 10

V. EVIDENTIARY ERRORS ............................................................................................ 11

# TABLE OF AUTHORITIES

**Cases**

*Bowen v. Maynard*,
   799 F.2d 593 (10th Cir. 1986) ............................................................................................. 11

*Cross v. Johnson*,
   169 F. Supp. 2d 603 (N.D. Tex. 2001) .................................................................................. 7

*In re Oil Spill*,
   No. MDL 2179, 2012 WL 85447 (E.D. La. Jan. 11, 2012) ................................................. 13

*Kelly v. United States*,
   140 S. Ct. 1565, 1571 (2020) ................................................................................................. 2

*Kyles v. Whitley*,
   514 U.S. 419 (1995) ............................................................................................................ 11

*Lindsey v. King*,
   769 F.2d 1034 (5th Cir. 1985) ............................................................................................. 11

*Lowenfield v. Phelps*,
   817 F.2d 285 (5th Cir. 1987) ............................................................................................... 11

*Loyal Am. Life Ins. Co. v. Bene Mkt. LLC,*
  No. 1:18-CV-408-RP, 2020 WL 4718839, at *4 (W.D. Tex. June 15, 2020), *report and recommendation adopted*, No. 1:18-CV-408-RP, 2020 WL 5745822 (W.D. Tex. Aug. 3, 2020) ................................................................................................................................ 1

*Rosemond v. United States*,
  572 U.S. 65 (2014) ................................................................................................................ 6

*Shaw v. United States*,
  580 U.S. 63 (2016) ................................................................................................................ 5

*United States v. Almeida-Biffi,*
  825 F.2d 830 (5th Cir. 1987) ................................................................................................ 8

*United States v. Constantinescu*,
  No. 4:22-CR-00612, 2024 WL 1221579 (S.D. Tex. Mar. 20, 2024) ................................. 5, 6

*United States v. Cornett,*
  195 F.3d 776 (5th Cir. 1999) .............................................................................................. 12

*United States v. Coversup,*
  No. CR 19-15-BLG-SPW, 2020 WL 4260519 (D. Mont. July 24, 2020) ............................ 7

*United States v. Duckworth,*
  51 F.3d 1045 (5th Cir. 1995) ................................................................................................ 8

*United States v. Eckerson,*
  108 F.3d 333 (5th Cir. 1997) ................................................................................................ 8

*United States v. Frazier*,
  625 F. Supp. 3d 752 (M.D. Tenn. 2022) .............................................................................. 7

*United States v. Greenlaw,*
  84 F.4th 325 (5th Cir. 2023) ............................................................................................. 2, 5

*United States v. Jackson*,
  220 F. App'x 317 (5th Cir. 2007) ......................................................................................... 6

*United States v. McConney*,
  728 F.2d 1195 (9th Cir. 1984) .............................................................................................. 8

*United States v. Meisel*,
  875 F.3d 983 (10th Cir. 2017) ............................................................................................ 10

*United States v. Perrault*,
  No. CR 17-02558-MV-1, 2019 WL 1375666 (D.N.M. Mar. 26, 2019) ............................. 11

*United States v. Ramirez,*
  963 F.2d 693 (5th Cir. 1992) ................................................................................................ 8

*United States v. Ratcliff*,
  488 F.3d 639 (5th Cir. 2007) ................................................................................................ 5

*United States v. Reed*,
  762 F. App'x 173 (5th Cir. 2019) ......................................................................................... 7

*United States v. Sager*,
  227 F.3d 1138 (9th Cir. 2000) .................................................................................. 11

*United States v. Saks*,
  964 F.2d 1514 (5th Cir. 1992) .................................................................................. 14

*United States v. Sandoval*,
  847 F.2d 179 (5th Cir. 1988) ...................................................................................... 8

*United States v. Smith*,
  44 F.3d 1259 (4th Cir. 1995) ...................................................................................... 7

*United States v. Sudeen*,
  434 F.3d 384 (5th Cir. 2005) .................................................................................... 14

*Wood v. Holiday Inns, Inc.*,
  508 F.2d 167 (5th Cir. 1975) .................................................................................... 14

**Statutes**

18 U.S.C. § 1347 .............................................................................................................. 1

42 U.S.C. § 1320a-7b ....................................................................................................... 1

**Other Authorities**

Fifth Cir. Pattern Jury Instr. § 2.59 (2019 ed.) ................................................................. 5

H.R. Rep. No. 104-736, at 258 (August 21, 1996), *reprinted in* 1996 U.S.C.C.A.N. 1990, 2071 . 4

**Rules**

Fed. R. Evid. 401 ............................................................................................................ 10

Fed. R. Evid. 402 ............................................................................................................ 10

Fed. R. Evid. 801(d)(2)(A) ............................................................................................. 12

Fed. R. Evid. 801(d)(2)(D) ............................................................................................. 13

Fed. R. Evid. 801(d)(2)(E) ............................................................................................. 13

Fed. R. Evid. 803(6) ....................................................................................................... 13

Fed. R. Evid. 805 ............................................................................................................ 12

I. **THERE IS INSUFFICIENT EVIDENCE TO SUSTAIN THE CONVICTIONS.**

In a word, the government's memorandum on these points is nonresponsive. It does not acknowledge a single case cited in Section I of Taba's memorandum, nor provide any cases of its own. The government consistently overplays its hand[1] in recounting the evidence from which it draws inference after inference. And instead of addressing the evidence as to the specific elements that were the basis of Dr. Taba's sufficiency claim—that he did not steal money from DOL and that he did not cheat DOL, the government focused on evidence of an agreement, knowledge, and willfulness—all claims not raised by Dr. Taba.

A. **To prove that Dr. Taba intended to cheat DOL, Dr. Taba must have submitted a claim for payment to DOL or received money from DOL. He did not.**

In its memorandum, as it did at trial, the government forgets that it charged Dr. Taba with healthcare fraud (18 U.S.C. § 1347), not the anti-kickback statute (42 U.S.C. § 1320a-7b). Conceding that Dr. Taba did not submit a claim to or receive payment from DOL, the government insists that doesn't matter. Instead, it diverts attention to the following incorrect or irrelevant facts:

- Agent Ertle's claim[2] that Dr. Taba told her in May 2016 that he did not have a copy of the promissory note as a basis to assert that the note was concocted after-the-fact, even though Taba began to repay the loan in November 2015. *Compare* Doc. 876 at 10 *with* GX 522.

- The promissory note was a sham as indicated by a lack of a counter signature by its holders, attorney, witness, or notary, when Texas law requires none of that. *Compare* Doc. 876 at 10 *with Loyal Am. Life Ins. Co. v. Bene Mkt. LLC,* No. 1:18-CV-408-RP, 2020 WL 4718839, at *4 (W.D. Tex. June 15, 2020), *report and recommendation adopted*, No. 1:18-CV-408-RP, 2020 WL 5745822 (W.D. Tex. Aug. 3, 2020) ("To recover on a promissory note under Texas law, the party seeking to enforce the note must show (1) a promissory

---

[1] *See, e.g.,* Doc. 876 at 6 (claiming that the evidence established that Taba agreed with Noryian, Nourian, Rydberg, and Williams when there was no evidence of *any* communications, let alone agreement with Nourian or Rydberg, and Williams's testimony concerned Taba's purported agreement with Noryian, not with Williams, himself).

[2] Agent Ertle's account of Dr. Taba's interview was rife with provably false mistakes or misunderstandings, including that James Noryian's Persian name was Dehshid, that Taba attended Rydberg's wedding, that Concentra was a pharmacy, that there were two loans to Dr. Taba, and the timing, circumstances, and payment of various construction projects. *See* Doc. 828 at 6-7; Doc. 873 at 4.

1

note exists, (2) the party sued signed the note, (3) the moving party is the owner or holder of the note, and (4) a balance is due and owing on the note.") (citations omitted).

- Draws on the promissory note were "mostly" made by Rydberg through a convoluted system of exchanging cashier's checks, even though there was no evidence that Dr. Taba knew of or was involved in any of the financial crimes charged, and Rydberg was listed as the remitter on only 3 out of 7 checks, and was an authorized signer on only one of those accounts. *Compare* Doc. 876 at 11 *with* GX 501, 534, 1022, *and* Mostly, Merriam-Webster, https://www.merriam-webster.com/dictionary/mostly#dictionary-entry-1 (last accessed Aug. 6, 2024) ("for the greatest part").

- Dr. Taba did not need a loan because he had enough money in his accounts, even though $1.02 million was committed as collateral to support an appeal bond while his attorneys negotiated a settlement to a civil suit, which was finally settled in July 2015. *Compare* Doc. 876 at 11 *with* GX 513.303, 523.051, 523.057, 524, 526.195, 1024.

None of this changes the fact that Dr. Taba did not cheat—*viz*. steal money from—DOL. The fact that Dr. Taba did not intend to cheat DOL undermines the convictions on all counts because it goes to the scheme to defraud, which requires an intent to deceive *and to cheat*. In *Kelly*, the Supreme Court held that the government needs to show not only that the defendant "engaged in deception," but that "an object of their fraud was property." *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020). That property must be from "the entity to be deceived." *United States v. Greenlaw*, 84 F.4th 325, 339 (5th Cir. 2023). Dr. Taba did not receive any property from DOL, or even property traceable to DOL. There is not sufficient evidence to sustain his healthcare fraud convictions.

**B. To prove that Dr. Taba intended to deceive DOL, Dr. Taba must have made a misrepresentation to DOL.  He did not.**

The government does not dispute that the indictment alleged misrepresentations in the form of "false and fraudulent claims to FECA and BCBS." Doc. 162 at 7, para. 31; *id.* at 15, paras. 58, 59. Instead, it ignores the difference between *prescriptions* and *claims*, and overstates the testimony. Under the fraud statutes, a misrepresentation is a lie made to the victim for the purpose of obtaining money or property. *Greenlaw*, 84 F.4th at 351. Even if the government's arguments

2

were supported by the trial testimony (they are not), they do not address the intent to deceive element necessary for a conviction on all of the counts. The unsupported arguments (that do not address the fact that Dr. Taba did not make a representation to DOL) include:

- That "Taba worked so closely with the pharmacies," that Taba "was intimately involved with the pharmacies, and that Taba "allowed pharmacy employees to help complete prescriptions at his office. *See* Doc. 876 at 12, 15. Those statements are hyperbole. No witness testified that Dr. Taba permitted Noryian's employees to stamp fraudulent prescriptions at his office. Megan Marines never met Taba and the word "stamp" appears nowhere in her testimony. Trial Tr. Vol. 4B, 172. She testified that she only ever talked to Melissa Driver at Dr. Taba's office, and that another pharmacy employee, Mona Gaudian, usually talked to Melissa, and that Ms. Marines covered for Mona when she was out. *Id.*, 165. The government did not call Ms. Gaudian as a witness. Kim Necessary, likewise, never met Dr. Taba. Trial Tr. Vol. 3B, 82. She went to his office twice with Mona Gaudian. *Id*. Once at the office, Melissa Driver[3] gave Necessary and Gaudian "the stack of prescriptions and a stamp of Dr. Taba's signature." *Id.* at 83. Not a single pharmacy employee testified that she ever met or spoke with Dr. Taba.

- That Taba was paid hundreds of thousands of dollars (August 2014 – February 2015) over the same time as prescriptions were billed to the DOL. But the government's own exhibits showed that Ability billed 75% of prescriptions and I&F billed 100% of prescriptions after February 2015. *Compare* Doc. 876 at 15 *with* Docs. 873-6, 873-7.

- That internal pharmacy records tracked Taba's prescriptions, but there was no evidence that Dr. Taba was aware of those records, kept his own tracking records, or received any payments consistent with the pharmacy's records. *See* Doc. 876 at 13.

- That "Taba's own patients in this case, whose patients formed the basis of counts seven through nine…, testified to the excessive medications they received and the fact that they notified Taba about this." Doc. 876 at 13. That's incorrect. Only J.A. testified that she told Dr. Taba that the scar gel didn't work and that she didn't want it anymore, and when she did, he assented. Trial Tr. Vol. 5B, 94-95. R.C. told an unidentified person in Dr. Taba's office that she was receiving too much cream, confirmed that she did not tell Dr. Taba, and Dr. Taba was not there when she told the unidentified office employee at an unidentified time. The government presented no evidence the message was relayed to Dr. Taba. *Compare* Doc. 876 at 13 *with* Trial Tr. Vol. 3A, 34-35; 48-49 (R.C. saw the nurse because Dr. Taba was out of the country). L.B. called the pharmacy, not Dr. Taba's office. *Compare* Doc. 876 at 13 *with* Trial Tr. Vol 4B, 12, 17. The government's account of the facts on this front is not supported by the record, either.

---

[3] Ms. Driver testified at the first trial that Dr. Taba did not know that Ability pharmacy was writing prescriptions using his stamp. Trial Tr. Vol. 5A, Oct. 25, 2022, 123. The government, however, did not call Ms. Driver as a witness at the second trial.

- Dr. Jiminez's expert, blanket conclusions were based on limited records the government subpoenaed from Dr. Taba for the range June 1, 2014 to June 6, 2016, and thus an incomplete record of the patients' medical records and treatment history, which in many instances predated the requested range and offenses charged by years. *See* Doc. 876 at 14.

The indictment alleged the submission of false and fraudulent *claims*, not *prescriptions*. The government does not (and cannot) dispute that the pharmacies submitted the claims charged, not Dr. Taba or his office. Thus, the pharmacies, not Dr. Taba, made the false statements.

The government does not address Dr. Taba's argument about the substantive counts head-on but draws general and overbroad conclusions unsupported by the record. It states that Ms. Narwaiz testified that "she did not think certain signatures on certain prescriptions were Taba's." Doc. 876 at 14. But she did not testify that she "did not think"—she unequivocally identified Dr. Taba's signatures, such as the examples provided by the government, *id.* at 15, or testified that a signature was not his. Trial Tr. Vol 22, 100-01. The government's depiction is not accurate. Ms. Narwaiz testified that the signature on the refill request for Count 9 was not Dr. Taba's. Full stop.

Instead of addressing the facts in the record in response to Count 8, the government relied exclusively on Dr. Jiminez's blanket *opinion* that none of Dr. Taba's prescriptions were medically necessary. But there are *facts* to show that this one was. *See* Doc. 860 at 5. The importance of the distinction between fact and opinion is highlighted by the legislative history of § 1347. The health care fraud statute is "not intended to penalize a person who exercises a health care treatment choice or makes a medical or health care judgment in good faith simply because there is a difference of opinion regarding the form of diagnosis or treatment." H.R. Rep. No. 104-736, at 258 (August 21, 1996), *reprinted in* 1996 U.S.C.C.A.N. 1990, 2071. Therefore, the statutes targeting health care fraud do not criminalize subjective medical opinions where there is room for disagreement. Thus, Jiminez's opinion is not sufficient to sustain Count 8.

4

## II. JURY INSTRUCTION ERRORS.

### A. The intent to defraud and scheme to defraud instructions were disjunctive.

The government's response omits entirely the incorrect (and nonpattern) disjunctive clauses in the recitation of the elements on page 18 of the jury instructions. Both the introductory clause and the first element phrase in the alternative "to defraud" *or* "to obtain money or property." The "or" inserted is not consistent with *Greenlaw,* or even with the Fifth Circuit's pattern instruction for health care fraud. *See* Fifth Cir. Pattern Jury Instr. § 2.59 (2019 ed.).

The government ignores the disjunctive in the intent to defraud instruction, too. The district court in *Greenlaw* somewhat inverted the scheme to defraud and intent to defraud instructions, but a recent analysis of *Greenlaw* by another district court can be applied here to the intent to defraud:[4]

> In addition to addressing the "intent to defraud" element, the Fifth Circuit in *Greenlaw* also discussed the necessary "scheme to defraud" element. This discussion, unfortunately, did not result in a clear holding. The Circuit was faced with a similar disjunctive "or" in the trial court's "scheme to defraud" instruction. The instruction defined "scheme to defraud" as "any plan, pattern or course of action intended to deprive another of money or property or bring about some financial gain to the person engaged in the scheme." *Id*. at 349. The Circuit panel declined to rule on whether this disjunctive "or" was erroneous (*i.e.*, whether an "and" would have been more appropriate). *Id*. at 352.
>
> Nevertheless, the Fifth Circuit cited authority that suggests a "scheme to defraud" requires depriving another of money or property and bringing about some financial gain to the defendant. For example, the Circuit panel cited *Shaw v. United States*, 580 U.S. 63, 73 (2016). In *Shaw*, the Supreme Court agreed with the parties that "the scheme must be one to deceive the bank and deprive it of something of value." *Id*. (emphasis in original). In addition, the Circuit cited *United States v. Ratcliff*, 488 F.3d 639, 645 (5th Cir. 2007), in which the Fifth Circuit affirmed the district court's order dismissing an indictment where it alleged only deceitful conduct and failed to allege a scheme that wronged the victim's property rights.

---

[4] That district court noted while it attempts to treat "intent to defraud" and "scheme to defraud" separately, "prior courts' discussions have not always been so delineated." *United States v. Constantinescu*, No. 4:22-CR-00612, 2024 WL 1221579, at *3 (S.D. Tex. Mar. 20, 2024).

> Thus, the clear implication is that the "scheme to defraud" element should also be in the conjunctive, and that the Government must not only plead a pattern of action that is intended or designed to bring about some financial gain to the wrongdoer, but also a pattern that is intended or designed to deprive another of money or property.

*Constantinescu*, 2024 WL 1221579, at *4.

Ignoring entirely the substantive counts, and eschewing any individual consideration, the government nevertheless concedes that Dr. Taba did not make any representations to the victim. Doc. 876 at 19 ("[T]hat Taba did not personally bill DOL is of no moment."); *but see* Superseding Indictment, Doc. 167 at 7, para. 31 ("[D]efendants and others submitted and caused the submission of approximately $158 million in "false and fraudulent claims to FECA[.]"). And while a defendant need not personally submit a claim, the Fifth Circuit has reversed where the government never linked the defendant to the billing. *See United States v. Jackson*, 220 F. App'x 317, 322–24 (5th Cir. 2007). *Pinkerton* and § 2 do not supply that missing link, however. "An intent to advance some different or lesser offense is not, or at least not usually, sufficient: Instead, the intent must go to the specific and entire crime charged[.]" *Rosemond v. United States*, 572 U.S. 65, 76 (2014). For example, knowledge of kickbacks would not be sufficient.

**B. Dr. Taba's good faith defense was not presented to the jury.**

The government's claims in this regard are contradicted by its own statements earlier in its brief that "there was almost no evidence admitted at trial supporting this [forgery] argument," Doc. 876 at 14, and the Court's rulings limiting his ability to present his defense of a legitimate loan, Doc. 631, and denying argument about the sequestration of funds to support his appeal bond, Trial Tr. Vol. 25, 78-79.

6

### III. RECESS AND SEVERANCE.

**A. The delay warranted a mistrial.**

At least one juror expressed concern about recall. Reporter's Tr., 67 (Oct. 23, 2023) ("[O]ne juror has already stated she has had a death in her family and that is affecting her mentally and psychologically."). No further evidence of the jurors' recall is available because the Court denied Taba's requests to poll the jury.

None of the non-binding cases the government offers are like Dr. Taba's. In *United States v. Reed*, 762 F. App'x 173, 175 (5th Cir. 2019), the recess was occasioned by the Government's late disclosure of a report to allow the defense time to evaluate the evidence, consider a plea, or adjust its strategy. The Fifth Circuit denied federal habeas relief to a state prisoner in *Cross v. Johnson*, 169 F. Supp. 2d 603, 616 (N.D. Tex. 2001), when the prosecutor had a cardiac event requiring bypass surgery after the first day of trial, and a substitute prosecutor was not available. The district judge in *United States v. Smith*, 44 F.3d 1259, 1267 (4th Cir. 1995) obtained consent from the parties for a mid-trial break so he could go on his vacation, and during that time, a defendant fell ill, extending the delay. To account for issues occasioned by this delay, the judge repeated instructions and reminders to the jury, orally and in writing, "to keep the case fresh in their minds and to keep an open mind until all the evidence was in." *Id.* at 1268. The district court in *United States v. Frazier*, 625 F. Supp. 3d 752, 756 (M.D. Tenn. 2022), also repeatedly admonished the jurors to keep an open mind and not reach any conclusions until the evidence has been concluded and they have been given the Court's final instructions.

*United States v. Coversup*, No. CR 19-15-BLG-SPW, 2020 WL 4260519, at *1 (D. Mont. July 24, 2020), went to trial on July 13, 2020—at the height of the COVID-19 pandemic. After the

7

first day of trial, a juror informed the court she had been exposed, and court recessed to await her test results, and because of the unavailability of jurors, no alternates were seated.

Finally, *United States v. McConney*, 728 F.2d 1195 (9th Cir. 1984) was tried before a judge, not a jury, and contained *no* discussion of any delay, let alone the 18-day delay that the government claims.

### B. The mid-trial severance of Noryian specifically prejudiced Dr. Taba and a mistrial should have been declared as to him, too.

In *United States v. Sandoval*, the dismissals occurred after voir dire—before opening and before any evidence had been presented. 847 F.2d 179, 182 (5th Cir. 1988)("After voir dire, Rodriquez and Villarreal pled guilty, and Villarreal turned state's evidence."). Similarly, the severed defendants in *United States v. Duckworth* absconded after jury selection but before trial began. 51 F.3d 1045 (5th Cir. 1995). The Court severed Noryian near the close of the government's case, not before it began.

The district court in *United States v. Almeida-Biffi* dismissed two defendants because there was not sufficient evidence of a conspiracy to introduce co-conspirator statements against them. 825 F.2d 830, 832 (5th Cir. 1987). That is a case of the little fish being dismissed, not the biggest fish, like here. *United States v. Eckerson* never mentioned Mitchell, the pleading co-defendant, in its recitation of facts or analysis of the sufficiency of the evidence. 108 F.3d 333 (5th Cir. 1997).

The government offers *United States v. Ramirez* as its strongest case, but there, the district court instructed the jury that "you should not consider the fact that six of defendants are no longer part of this trial." 963 F.2d 693, 700–01 (5th Cir. 1992). The Fifth Circuit found, "*[u]nder the circumstances,* these instructions were sufficient to cure any prejudicial impact from the successive dismissals of defendants." *Id.* at 701 (emphasis added). Contrast that with the instructions given to Dr. Taba's jury: "Even though [James Noryian] is no longer a part of this trial, *you may still*

8

*consider all of the evidence presented concerning him*." Doc. 723 at 14 (emphasis added). That instruction runs contrary to every case cited by the government, and was especially prejudicial to Taba because evidence admitted against Noryian was not admissible against him. *See* Doc. 860, Section V.

The government then ignores critical facts including Noryian's objections to Taba's exhibits, and Noryian's objections to Taba's counsel's questions of witnesses concerning Noryian's propensity for lying. It further offers no response to the balance of the evidence concerning Noryian that did not concern Taba at all. The strength of this issue is revealed by the government's hyperbole, supported by very little applicable law or factual analysis.

Case in point: the government decries the anticipated cross-examination of Noryian as a "farce," "dubious," and "without support in the record." Doc. 876 at 26.[5] Indeed, it was clear to the parties that Noryian intended to testify: "Mr. Noryian, James Noryian, wants to testify." Reporter's Tr., Oct. 31, 2023 at 9 (The Court discussing length of trial remaining). "We look at direct examination. We look at cross-examination. Mr. James Noryian is going to be on the stand for a long time, from direct examination and cross-examination, and there is no way we are going to be through with him in a day or day and a half. It is probably closer to three days." *Id.* at 10 (same). "Those are the things off the top of my head that I am coming up with that would be fertile ground for cross-examination [of Mr. Noryian] that I think would be very fruitful for Dr. Taba." *Id*. at 51 (Mr. Wyatt discussing desire to proceed with Mr. Noryian at trial).

---

[5] In a similar vein, the government, without any foundation, attacks Mr. Wyatt's credibility, dismissing the contents of his sworn and supported declaration as "allegedly." Doc. 876 at 25.

9

## IV. THE DISMISSAL OF MOFID AND L. NOURIAN WAS NOT SIMPLY A MATTER OF PROSECUTORIAL DISCRETION.

The government incorrectly characterizes this as a "matter of prosecutorial discretion" and "the government's charging decision." Doc. 876 at 28. Those characterizations are incorrect. Federal Rule of Criminal Procedure 48 requires a motion and leave of Court. The dismissal of Mofid and L. Nourian is not a matter of charging discretion—that occurred when they were indicted, and the government's reliance on selective prosecution cases has no bearing on this Sixth Amendment claim. Rather, the dismissal of these parties was an act by a party that made Mofid's L. Nourian's participation in criminal activities—as alleged in the indictment—more or less probable. *See* Fed. R. Evid. 401, 402.

Here, as above, the government rehashes the same debunked arguments that are not truthful recitations of the record. The government then misconstrues Taba's claim as asking the jury to opine on the guilt of others, which is not correct. Taba's claim is that he was charged with engaging in illegal conduct with Mofid and L. Nourian. Taba's defense has always been that he did not commit a crime. The government's dismissal of them is a statement of a party opponent that is admissible and relevant to that theory. It is the government's conduct that is in play in this claim, not Taba's.

While it is not sufficient for a defendant merely to offer up unsupported speculation that another person may have done (or not done) the crime, such evidence is admissible if a defendant's proffered evidence, on its own or in combination with other evidence in the record, shows a nexus between the crime charged and the asserted theory. *United States v. Meisel*, 875 F.3d 983, 991, 1002 (10th Cir. 2017) (citations and internal quotation marks omitted). Orders barring Taba from introducing the evidence as it related to the allegations in the indictment and the dismissal of Mofid and L. Nourian were erroneous.

The defense is entitled to undermine and question the "thoroughness and even the good faith of the investigation," *Kyles v. Whitley*, 514 U.S. 419, 445 (1995) and "the police methods employed" in assembling the case, *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985). *See also Bowen v. Maynard*, 799 F.2d 593, 611 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant . . .") (*citing Lindsey*). As such, defendants are "entitled to present evidence relating to the overall quality of the government's investigation." *United States v. Sager*, 227 F.3d 1138, 1146 (9th Cir. 2000). Since at least 1987, the Fifth Circuit recognized that a defendant's strategy to argue that "sloppy police work reflected adversely on the state's entire case" was reasonable. *Lowenfield v. Phelps*, 817 F.2d 285, 291–92 (5th Cir. 1987). "To tell the jury that it may assess the product of an investigation, but that it may not analyze the quality of the investigation that produced the product, illogically removes from the jury potentially relevant information." *Sager*, 227 F.3d at 1145. "The quality or bias of the government's investigation that produces the evidence that is submitted to the jury may affect the reliability of the evidence, and would therefore be relevant information." *United States v. Perrault*, No. CR 17-02558-MV-1, 2019 WL 1375666, at *1 (D.N.M. Mar. 26, 2019).

Contrary to the government's assertions, the fact that that Mofid and L. Nourian were charged, the specific conduct with which they were charged, and their ultimate dismissal concerned the quality of the government's investigation and the evidence it produced.

## V.  EVIDENTIARY ERRORS

The government ignores indisputable facts to proclaim that there was no disparity in the charges and evidence against Taba and Noryian. The government's indictment charged Taba in 4 counts; Noryian in all 17. Doc. 162. The government called many witnesses who never uttered

Taba's name, or never met him. *See generally* Doc. 860 at 14. And the three pieces of hearsay evidence that should not have been admitted are at the centerpiece of the government's factual arguments in its opposition, and particularly concerning sufficiency. See Doc. 876 at 10-12, 25.

Sensing thin ice, the government quickly skates over the co-conspirator exception because Hedayat's testimony plainly does not fall within it. There is no question that Hedayat was not a co-conspirator, and thus Noryian's statements to her were not "among conspirators." *United States v. Cornett*, 195 F.3d 776, 783 (5th Cir. 1999). The government follows up with a diversion, casting the testimony as a description of an action, not the recitation of a statement. The transcript shows otherwise. The question called for statements. The statements, underlined, provide the critical (and objectionable) components. If Hedayat only testified that Noryian showed her an envelope with cash, it would not have implicated Taba:

> **Q.** (By Mr. Emokpae) What did he say?
> **A.** We were at a dinner, and <u>he said that he had helped Dr. Taba put his house in an LLC so that he will not lose it in case something happened</u>. And then he pulled out an envelope, a white envelope from his back pocket, opened it, and it was hundred-dollar bills. And <u>he said, "This is $5,000." And he said I'm going to see him after our dinner so I can give this to him and thank him for helping me with my pharmacy</u>.

Trial Trans. Vol. 10B, 27 (Oct. 5, 2023).

In defending Robbie Jossa's inadmissible hearsay testimony, the government misconstrues the concept of hearsay as to turn it on its head, claiming that it contained Taba's statement, admissible under Rule 801(d)(2)(A). Incorrect. Jossa testified to what *Noryian* told him. Not a single line of testimony concerned what Taba told Jossa. Thus, Noryian's statements to Jossa were hearsay as to Taba. The fact that Noryian told Jossa something Taba told Noryian does not remove that statement out of the prohibition against hearsay. *See* Fed. R. Evid. 805. The government cannot

get past the first layer of hearsay: what Noryian told Jossa. And it cannot do so by arbitrarily rearranging what it deems the first, second, or third layers of hearsay.

Second, the government claims for the first time in the long history of this case that Jossa was a co-conspirator. But it never disclosed him as one and it is too late to change that now. It doesn't matter, though, because the facts don't bear it out—Jossa was not involved with DOL claims or patients, never paid a doctor to write a prescription, and the discussion concerned his neuropathy clinic business, not compound creams.

Concerning GX 716, the government moved to admit this email as a business record. Taba did not conflate authenticity with the business record exception; he cited the controlling method for admitting an email under Rule 803(6) which requires, among other things, that "a custodian or qualified witness must attest that these conditions have been fulfilled—which certainly requires an email-by-email inquiry. Fed. R. Evid. 803(6)(D)." *See In re Oil Spill*, No. MDL 2179, 2012 WL 85447, at *3 (E.D. La. Jan. 11, 2012) (Barbier, J.) (some citations omitted). This final requirement follows "it must be the producing defendant's regular practice to send or receive emails that record the type of event(s) documented in the email. … This would require proof of a policy of the producing defendant to use email to make certain types of reports or to send certain sorts of communications; it is not enough to say that as a general business matter, most companies receive and send emails as part of their business model." *Id.*; *but see* Trial Tr. Vol. 4B, 131 ("Q. Was writing emails a regular practice of the pharmacy? A. Yes."), *id.*, 132 ("Q. (By Mr. Womble) Ms. Marines, was writing emails part of the regular practice of the pharmacy? A. Yes.").

Only as a backup did the government offer Rule 801(d)(2)(D); it never asserted that this email was a co-conspirator statement under Rule 801(d)(2)(E). The government complains about Taba's authority applying Fifth Circuit law to an analogous situation—whether the agent exception

13

applies in relation to who is a party to the litigation. *See* Doc. 876 at 40. But *Wood v. Holiday Inns, Inc.*, 508 F.2d 167 (5th Cir. 1975) does not concern, nor provide any analysis about the exceptions to the rule against hearsay. In *United States v. Saks*, the co-defendants were general partners in the same company. 964 F.2d 1514, 1524 (5th Cir. 1992). And in *United States v. Sudeen*, there was evidence that the out-of-court statements were made by persons who were outwardly represented as agents, associates, or business partners of the defendant. 434 F.3d 384, 390–91 (5th Cir. 2005). None of the cases concern an employment relationship. Those cases do "not consider the question of whether an employee of a company owned or controlled by a criminal defendant is the defendant's agent under Rule 801(d)(2)(D)." *See* Doc. 876 at 40.

But even accepting for purposes of this argument that Marines in Noryian's agent, that admits the testimony against Noryian, not against Taba. Marines is on the stand repeating an out of court statement that she made (first layer) concerning what Noryian told her (second layer) that Noryian claimed Taba said (third layer). Driver's statements in the emails are concededly minimal, so whether there is proper evidence to support a conclusion that Driver is Taba's agent is beside the point. The issue lies with the fact that Marines's hearsay testimony, while admissible against Noryian, is not admissible against Taba because she was not Taba's agent, and because the email did not satisfy the business record exception.

The government's response to the errors in Cook's testimony is its final miss.

First, the Court made clear it took issue with "the total amounts billed." Trial Trans. Vol. 3A, 18-19 (Sept. 21, 2023). The government nonetheless extracted that exact calculation from Cook via testimony after it withdrew its exhibits. Trial Trans. Vol. 2A, 47 (Sept. 20, 2023)("Q. Can you give pause [sic] ballpark of the total amount billed by the pharmacies for L[] B[]? A. Over $480,000."); Trial Trans. Vol. 2A, 50-51 (Sept. 20, 2023)(" Q. Can you give us a ballpark of the

total amount billed by the pharmacy for just J[] A[]? A. Over $300,000."). On this point, the government offers no response.

Second, the government's newly debuted TCN calculations don't change the outcome. Even though nothing in Cook's testimony explained how he determined the number of claims he testified to, this method proves no better, and the bottom line of the sums billed and paid remain the same:

| | L.B. Claims Data | | | |
|---|---|---|---|---|
| | TCNs | RXs | Billed | Paid |
| GX 212 | 8 | 4 | $ 28,630.90 | $ 10,036.84 |
| GX 214 | 8 | 4 | $ 27,831.52 | $ 9,757.06 |
| GX 217 | 40 | 36 | $ 181,011.31 | $ 141,560.25 |
| Total | 56 | 44 | $ 237,473.73 | $ 161,354.15 |
| Cook Testimony | >70 | | $ 480,000.00 | >$250,000.00 |

| | J.A. Claims Data | | | |
|---|---|---|---|---|
| | TCNs | RXs | Billed | Paid |
| GX 212 | 8 | 4 | $ 27,787.90 | $ 9,741.81 |
| GX 214 | 2 | 1 | $ 1,294.20 | $ 456.97 |
| GX 217 | 32 | 32 | $ 95,753.02 | $ 78,413.35 |
| Total | 42 | 37 | $ 124,835.12 | $ 88,612.13 |
| Cook Testimony | >50 | | >$300,000.00 | >$125,000.00 |

Finally, the remittance vouchers are irrelevant to Cook's erroneous testimony and provide further support for Dr. Taba's sufficiency claim, as the claims underlying Counts 7, 8, and 9 are not in GX 239 (remittance vouchers) at all. The problems with GX 301-303 are likewise well documented. *See* Doc. 828 at 7-18; 873 at 2, 6-8.

For these reasons, and those set forth in Dr. Taba's original memorandum, the record supports the entry of a judgment of acquittal on one or more counts, or a new trial on the rest.

Respectfully submitted,

*/s/ Sara A. Johnson*
Sara A. Johnson
Texas Bar No. 24117874
700 Camp Street
New Orleans, LA 70130
(504) 528-9500
sara@sarajohnsonlaw.com

Counsel for Michael Taba

**CERTIFICATE OF SERVICE**

This certifies that I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system that will send a notice of electronic filing to all counsel of record.

Dated: August 12, 2024.

*/s/Sara A. Johnson*
Sara A. Johnson

16