IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | Criminal Case **3:17-CR-155-L** |
| | § | |
| **MICHAEL TABA (07)** | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant "Michael Taba's Motion for a Judgment of Acquittal (R. 29)

and Motion [for] New Trial (R. 33)" ("Motion") (Doc. 860), filed July 8, 2024. After considering

the Motion, the parties' briefs, the record, and applicable law, the court **denies** the Motion (Doc.

860).

## I.    Factual and Procedural Background

In 2017, a two-count Indictment (Doc. 3) charged Jamshid Noryian, a/k/a James Noryian;

Dehshid Nourian, a/k/a David Nourian; Christopher Rydberg; Ashraf Mofid, a/k/a Sherri Mofid

("Sherri Mofid"); Leyla Nourian; Leslie Benson; Michael Taba; and Kevin Williams with crimes

arising from a fraudulent health care and related money laundering scheme. In September 2019, a

seventeen-count Superseding Indictment (Doc. 162) was filed, alleging that:

> Defendants and others unlawfully submitted and caused to be submitted false and
> fraudulent claims to Federal and commercial health care programs for prescriptions
> for compound drugs. Health care benefit programs paid millions of dollars on these
> false and fraudulent claims. These prescriptions, as defendants knew and intended,
> were among other things, not legitimately prescribed, not needed, not used, and
> induced through the payment and receipt of kickbacks and bribes.

Doc. 162 ¶ 30. The Superseding Indictment further alleged that certain Defendants, including

Defendant Rydberg, engaged in a money laundering and tax evasion scheme to conceal the source

and nature of the fraudulent health care proceeds. Except for Defendant Williams, all other persons

previously named as Defendants in the original Indictment were named in the Superseding

Indictment in addition to Ali Khavarmanesh. There has been little activity in this case, however, with respect to Defendant Khavarmanesh since that time.

Defendant Williams was not named as a Defendant in the Superseding Indictment because he pleaded guilty in August 2019, pursuant to a plea agreement, to Count 1 of the original Indictment (Conspiracy to Commit Healthcare Fraud). Prior to the charges in this case being brought, Defendant Williams was a licensed physician with a primary practice in orthopedic surgery in the State of Texas and the owner of Ennis Orthopedics PA.

In June 2022, the charges against Defendant Benson were dismissed after his death. The charges against Defendants Leyla Nourian and Ashraf Mofid were also dismissed in October 2022. The remaining four Defendants—James Noryian, the owner and operator of Ability Pharmacy, Inc. ("Ability Pharmacy"); David Nourian, the pharmacist-in-charge at Ability Pharmacy; Christopher Rydberg, the Chief Financial Officer at Ability Pharmacy; and Michael Taba, a licensed physician and member of Advanced Orthopedics—elected to proceed to trial. The court refers to these four Defendants collectively as the "Trial Defendants."

The Superseding Indictment charged the Trial Defendants with the following offenses in connection with the elaborate health care fraud scheme:

- Count 1: Conspiracy to Commit Healthcare Fraud, in violation of 18 U.S.C. § 1349 (18 U.S.C. § 1347) (all Trial Defendants)

- Counts 2 through 9: Healthcare Fraud, in violation of 18 U.S.C. §§ 1347 and 2 (Jamshid Noryian, Dehshid Nourian, and Michael Taba)[1]

- Count 10: Conspiracy to Launder Money and Engage in Monetary Transactions in Criminally Derived Property, in violation of 18 U.S.C. § 1956(h) (Jamshid Noryian, Dehshid Nourian, and Christopher Rydberg)

---

[1] Of these Healthcare Fraud Counts, Defendant Taba was only charged in Counts 7, 8, and 9. In the court's orders addressing Defendants Rydberg's and Nourian's post-trial motions under Rules 29 and 33, the court mistakenly indicated that Defendant Taba was charged in Counts 2 through 9.

- Counts 11 through 16: Money Laundering, in violation of 18 U.S.C. § 1956 (a)(1)(B)(i) (Jamshid Noryian, Dehshid Nourian, and Christopher Rydberg)

- Count 17: Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371 (Jamshid Noryian, Dehshid Nourian, and Christopher Rydberg)

The first trial against the four Trial Defendants resulted in the court granting the Trial Defendants' request for a mistrial on November 21, 2022, after one of the defense attorneys underwent a medical procedure that resulted in a prolonged delay in the trial proceedings. The second trial against the four Trial Defendants commenced on September 11, 2023. During the second trial, the Government admitted over 260 exhibits and called twenty-eight witnesses to testify. Defendant Williams was a key trial witness for the Government, and he testified at length regarding his and the Trial Defendants' involvement in the health care fraud scheme.

Defendant James Noryian was severed from the trial on November 3, 2023. A determination as to when Defendant Noryian will be tried separately has not been made. On November 16, 2023, a jury found the remaining three Trial Defendants guilty on all counts charged against them in the Superseding Indictment. Doc. 725. In this regard, Defendant Taba was found guilty beyond a reasonable doubt on Counts One for Conspiracy to Commit Health Care Fraud and Counts Seven, Eight, and Nine for Health Care Fraud and Aiding and Abetting. Following that verdict, the three remaining Trial Defendants—Defendants David Nourian, Rydberg, and Taba— filed their respective postjudgment motions pursuant to the orders entered by the undersigned. Briefing on Defendant Taba's Motion was complete on July 29, 2024, when the Government filed its response in opposition to the Motion.

In his Rule 29 Motion, Defendant Taba contends that the Government's evidence is insufficient to support his convictions because the Government did not prove that: (1) he intended to steal money from the Department of Labor ("DOL"); or (2) he made any misrepresentation to the DOL. In his Rule 33 Motion, Defendant Taba argues that he is entitled to a new trial because:

(1) two jury instruction errors warrant a new trial; (2) the three-week recess and severance of Defendant James Noryian and the related denial of a mistrial prejudiced him; (3) the court's ruling precluding him from raising the dismissal of the charges against Sherri Mofid and Leyla Nourian breached his right to present a defense; and (4) certain evidentiary errors occurred.

## II.    Motion for Judgment of Acquittal

### A.  Rule 29 Legal Standard

A motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 challenges "the sufficiency of the evidence to sustain a conviction." *United States v. Uvalle-Patricio*, 478 F.3d 699, 701 (5th Cir. 2007). "[A] defendant seeking reversal on the basis of insufficient evidence swims upstream." *United States v. Mulderig*, 120 F.3d 534, 546 (5th Cir. 1997). In reviewing a defendant's challenge to the sufficiency of the evidence, "it is not the reviewing court's role to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Terry v. Hooper*, 85 F.4th 750, 754 (5th Cir. 2023) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)), *cert. denied*, ⸺ U.S. ⸺, 144 S. Ct. 1074 (2024).  Instead, the reviewing court's role is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19 (internal quotation marks omitted). "In evaluating the sufficiency of the evidence, the court views all evidence, draws all reasonable inferences, and makes all credibility determinations in the light most favorable to the verdict." *United States v. Drouin*, 470 F. App'x 379, 488 (5th Cir. 2012) (citing *United States v. Mendoza*, 522 F.3d 482, 488 (5th Cir. 2008)). The court determines "only whether the jury made a rational decision, not whether its verdict was correct on the issue of guilt or innocence." *United States v. Dean*, 59 F.3d 1479, 1484 (5th Cir. 1995) (citations omitted).  "[I]f the fact finder was presented with sufficient evidence to support the verdict reached, that verdict must be upheld,"

*United States v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005), and "[a]ll reasonable inferences [that] tend to support the Government's case must be accepted" with "[a]ny conflicts in the evidence [being] resolved in the Government's favor." *United States v. Burns*, 597 F.2d 939, 940-41 (5th Cir. 1979) (citations omitted). "[I]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Montes*, 602 F.3d 381, 388 (5th Cir. 2010) (citation omitted). "A jury is free to choose among reasonable constructions of the evidence." *Id.* at 388 (citation omitted).

### B.  Discussion

Defendant Taba first argues that the Government failed to prove beyond a reasonable doubt that he intended to cheat or steal from the victim—the DOL.  He argues that evidence of deception alone is insufficient because Title 18 fraud statutes require evidence that a defendant deceived *and* cheated the victim.  According to Defendant Taba, there is insufficient evidence to show that he cheated the DOL because the evidence establishes that the pharmacies submitted claims to and were paid by the DOL, not him or his office; no DOL funds were traced to him; the prescriptions in his name were forged by someone at the pharmacies; and the $714,000 in payments he received from Ashraf "Sherri" Mofid between September 8, 2014, and February 21, 2025, were loans:

> 1) the pharmacies submitted claims to DOL, not Taba and/or his office; 2) DOL paid the pharmacies, not Taba and/or his office (GX 1009); 3) no DOL funds were deposited into bank accounts used to issue draws to Taba on his loan from Leyla Nourian and Ashraf Mofid (compare GX 1009 to GX 1021); 4) no DOL funds were traced to Taba (GX 1025); and 5) the draws from the loan ended before specific acts charged in Counts 7-9 (GX 1021):

Doc. 860 at 2. Defendant Taba asserts that this evidence undermines the convictions on all of the counts against him "because it goes to the scheme to defraud, which requires an intent to deceive

*and* to cheat," and the jury was instructed that it only needed to find "an intent to deceive *or* to cheat" to find him guilty. *Id.* (noting that the jury instruction argument is discussed in more detail in connection with his request for a new trial). Defendant Taba further asserts that "[t]his claim does not require the district court to assess the credibility of any witness," and, even "viewing the evidence in the light most favorable to the prosecution—and relying on the prosecution's exhibits—a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt because Taba did not cheat DOL." Doc. 860 at 2.

Defendant Taba also makes the related argument that the Government failed to prove that he made any misrepresentations to the DOL in the form of "false and fraudulent claims" to the Federal Employees' Compensation Act ("FECA") Claims Administration and Blue Cross Blue Shield ("BCBS") as alleged in the Superseding Indictment. *Id.* at 3 (quoting Doc. 162 ¶¶ 31, 58, 59). Once again, he argues that the evidence shows that neither he nor his office submitted claims to the DOL; rather, the pharmacies submitted claims to the DOL, such that the pharmacies made false statements to the DOL, not him. Defendant Taba contends that, even assuming that the payments to him were kickbacks rather than loans, this is not enough for a health care fraud conviction, and this is not the first time that the Government has charged health care fraud but then tried a kickback scheme, which is a different offense. For support, Defendant Taba relies on *United States v. Jackson*, 220 F. App'x 317, 322-24 (5th Cir. 2007),[2] which he asserts reversed a section

---

[2] Defendant Taba also cites *United States v. Merino*, 846 F. App'x 494, 495–97 (9th Cir. 2021), for the conclusion that the Ninth Circuit reversed "§§ 1347, 1349 convictions for insufficient evidence because [the] government showed the defendant 'knew she was accepting kickbacks—which is in violation of the Title 42 anti-kickback statutes—for recruiting patients to [co-defendant] Glazer's clinic, not that she knew Glazer was billing Medicare fraudulently' and showed the defendant's "deceptive behavior [wa]s consistent with that of an individual who believe[d] herself to be engaged in an unlawful kickback scheme, [but] not enough to sustain her fraud convictions." He cites *United States v. Medina*, 485 F.3d 1291, 1298 (11th Cir. 2007), for the conclusion that "paying kickbacks alone is not sufficient to establish health care fraud . . . without someone making a knowing false or fraudulent representation to Medicare." These cases, as well as *Mattia*, are not binding on the court. Regardless, they are factually distinguishable. There was sufficient evidence that Defendant Taba was aware that he was participating in an illegal health care fraud scheme. That he was paid through an elaborate kickback scheme involving cashier's checks for his participation does not change this.

1347 health care fraud conviction because the Government failed to link the defendant or his consultation services to the clinic's fraudulent billing.

Based on *United States v. Mattia*, No. 2:21-CR-00576 (BRM), 2024 WL 2834154, at *1, 6-7 (D.N.J. June 3, 2024), Defendant Taba also argues that "[w]riting a prescription is not the same as submitting a claim to the payor" because the court in *Mattia* dismissed as insufficient the health care fraud allegations against the defendant, who "allegedly paid bribes to get 'medically unnecessary' prescriptions where 'false and fraudulent claims,' not the prescriptions, were submitted to health plan." Doc. 860 at 4. In addition, Defendant Taba contends that the Government's evidence of prescriptions is "faulty" or not worthy of credence because of issues concerning his signature and the origin of the prescriptions. Alternatively, he argues that there is "compelling evidence" that the prescription for compound cream as charged in Count 8 was medically necessary, but Ability Pharmacy "then used this medically necessary prescription to continue to refill this patient's prescriptions without [his] knowledge or consent." *Id.* at 5. Defendant Taba, therefore, contends that "[t]he jury's conclusion of guilt on this charge was unreasonable and not supported by evidence, [and] reflects the prosecution's piling of 'inference upon inference[.]'" *Id.* at 5-6 (quoting *United States v. Maseratti*, 1 F.3d 330, 337 (5th Cir. 1993)) (citations omitted).

The Government counters, and the court agrees, that the evidence against Defendant Taba as detailed in the Government's response was overwhelming and sufficient to prove his participation in the health care fraud and health care fraud conspiracy to steal money from and deceive the DOL through the submission of false and fraudulent claims for medically unnecessary compound creams in exchange for payments in the form of kickbacks. The trial evidence identified in the Government's response refutes Defendant Taba's assertions and offered jurors a different version of events than that advanced or urged by him. Thus, his effort at pointing to various bits

or snippets of evidence that he believes supports his version of events is not enough to overcome the evidence presented by the Government during the trial of this case, which the jury obviously accepted in finding him guilty beyond a reasonable doubt on all counts charged against him. More importantly, the evidence relied on by Defendant Taba does not show that jury's decision, based on its evaluation of all of the evidence, was not rational.

Accordingly, despite Defendant Taba's asserted defenses based on forged prescriptions and loans, the jury obviously and reasonably rejected such defenses by finding him guilty.  The trial evidence necessarily involved credibility determinations with respect to the witnesses who testified regarding his involvement in the health care fraud and related conspiracy, as well as the circumstantial and documentary evidence. Drawing all reasonable inferences and making all credibility determinations in the light most favorable to the verdict, the evidence of Defendant Taba's guilty knowledge and intent to steal from and deceive the DOL was more than sufficient to support the jury's verdict.

Unlike *United States v. Jackson*, the Government here presented sufficient evidence from which the jury could have reasonably concluded that the evidence linked Defendant Taba and his medically unnecessary prescriptions to the pharmacy billing.  That Defendant Taba was also paid kickbacks for his participation in the health care fraud scheme is, therefore, inconsequential. Further, the Government did not pile unreasonable "inference upon inference" to obtain a conviction, as there was no need for it to do so. While no single piece of evidence alone may be sufficient, the combined evidence and the logical inferences that can be drawn from that evidence based on reason and common sense are more than sufficient to establish the elements of each offense and counts disputed by Defendant Taba. Moreover, the jurors, as the factfinders were in the best position to evaluate the evidence and assess the credibility of the witnesses who testified to determine whether the Government met its burden of proof. Based on the summary of evidence

in the Government's response (Docs. 876 at 4-11), the court's own recollection of the evidence presented at trial, and viewing the evidence in the light most favorable to the Government, the court concludes that there was sufficient evidence, both direct and circumstantial, from which the jury could have found beyond a reasonable doubt the essential elements of each count and offense that are the subject of Defendant Taba's Rule 29 Motion.

## III.    Motion for New Trial

### A.  Rule 33 Legal Standard

Rule 33(a) of the Federal Rules of Criminal Procedure allows the court, upon a defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires." The Fifth Circuit has explained that "justice so requires" whenever there exists an "error of sufficient magnitude to require reversal on appeal." *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004). "[M]otions for new trial are not favored, and are granted only with great caution." *United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997) (citation omitted). Consequently, "[t]he remedy of a new trial is rarely used; it is warranted only whe[n] there would be a miscarriage of justice or whe[n] the evidence preponderates heavily against the verdict." *Id.* (citation and internal quotation marks omitted); *Wall*, 389 F.3d at 466 (same).  Further, a court may not grant a motion for new trial absent a "demonstration of adverse effects on substantial rights of a defendant." *Id.*

In expounding on this standard and to assist district courts in deciding whether to grant a Rule 33 Motion, the Fifth Circuit has stated as follows:

> In determining whether to grant the motion, the district court must carefully weigh the evidence and may assess the credibility of the witnesses during its consideration of the motion for new trial, but must not entirely usurp the jury's function, or simply set aside a jury's verdict because it runs counter to [the] result the district court believed was more appropriate.
>
> Setting aside a jury's guilty verdict in the interests of justice may be appropriate under circumstances [when] the evidence brought forth at trial may tangentially support the verdict, but in actuality, preponderates sufficiently heavily

against the verdict such that a miscarriage of justice may have occurred. Similarly, while vested with discretion to grant a new trial pursuant to Rule 33 if necessary in accordance with the interests of justice, we have observed that this power should be exercised infrequently by district courts, unless warranted by exceptional circumstances.

*United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005) (internal quotation marks and citations omitted).

### B.  Discussion

#### 1.  Jury Instructions

Defendant Taba first argues that he is entitled to a new trial because of errors in the Court's Instructions to the Jury regarding his intent and good faith.

##### a.  Jury Instructions Regarding Intent

Defendant Taba contends that the jury instruction for health care fraud, 18 U.S.C. § 1347, incorrectly set forth one of the elements or requirements for this offense in the disjunctive.  In this regard, he argues that the instruction as written allowed the jury to find him guilty if it found intent to deceive *or* cheat rather than both intent to deceive *and* cheat.  He asserts that this is important because there was no evidence that he: (1) submitted claims to the DOL; (2) received any funds from the DOL; or (3) received loan payments from DOL funds. He further asserts that all of the acts charged in Counts 7 through 9 of the Superseding Indictment (June through July 2015) occurred after the last payment to him in February 2015. Defendant Taba also argues that that model jury instructions are only proper if they are correct statements of law, and that the court's instruction in this case runs counter to Fifth Circuit authority.  Doc. 860 at 7 (citing *United States v. Greenlaw*, 76 F.4th 304, 329 (5th Cir.), *opinion withdrawn and superseded on denial of reh'g*, 84 F.4th 325 (5th Cir. 2023).[3]

---

[3] As Defendant Taba acknowledges, the version of *Greenlaw* that he cites in his Motion was withdrawn by the Fifth Circuit and superseded.  *See id.*  The court's citations herein to *Greenlaw* are, therefore, to *United States v. Greenlaw*,

The Government disagrees that the instruction was erroneous but contends that, even assuming that it was, the result would have been the same, making any error harmless:

> Here, the verdict would have been unchanged because there was substantial evidence presented at trial from which a jury could find that Taba and his coconspirators intended to cause a financial loss to the DOL or to enrich themselves. *See United States v. Allende-Garcia*, 407 F. App'x 829, 836 (5th Cir. Jan. 11, 2011) ("Therefore, even if the jury had been properly instructed on the financial gain element, we are certain beyond a reasonable doubt that the jury would still have found that [the defendant] acted for the purpose of his own personal financial gain."). The entire goal of the conspiracy was to cheat DOL so that the coconspirators could enrich themselves. Taba knew the patients he referred to the pharmacies were insured by the DOL, that the templated prescriptions were medically unnecessary, and that the prescriptions would be used to bill the DOL. The patients got the same combination of expensive and ineffective drugs in excessive amounts. (Oct. 4, 2023 Tr., Vol. 9B, at 135.) It defies common sense that Taba would have been paid for referrals that the pharmacy had no intention to bill and be paid for. The fact that Taba did not personally bill the DOL is of no moment; his coconspirators did to complete the scheme. The law does not require that a defendant personally submit the fraudulent billing in order to be guilty of health care fraud. (Dkt. 723 at 32-34 (instructing the jury on aiding and abetting and Pinkerton. *Pinkerton v. United States*, 328 U.S. 640 (1946) [(liability).])

> The government also presented evidence that Taba engaged in the scheme to personally enrich himself. He referred patients to the pharmacies to obtain illegal kickbacks. There is no question that there was sufficient evidence here for the jury to conclude that the scheme's goal was not just to deceive the DOL but to cheat it out of money. As such, any error that could be claimed in these instructions was harmless.

Doc. 876 at 14-15.

The Fifth Circuit's Pattern Jury Instructions for criminal cases are not legally binding; however, as Defendant Taba acknowledges, a jury charge that tracks such instructions does not constitute error when the instruction correctly states the law. *United States v. Toure*, 965 F.3d 393, 402-03 (5th Cir. 2020) (explaining that the Fifth Circuit has "previously confirmed that a 'district court does not err by giving a charge that tracks this Circuit's pattern jury instructions and that is

---

84 F.4th 325 (5th Cir. 2023). Knowing this, he should not have cited to the earlier version of *Greenlaw* as relevant authority.

a correct statement of the law.'") (citation omitted).  The court first notes that Defendant Taba did not previously argue that the court's instructions that track the Fifth Circuit's Pattern Jury Instructions regarding the intent required for health care fraud under § 1347 do not correctly state the law. Not only did Defendant Taba not timely object to the court's use of an instruction that substantially tracks the instruction in the 2019 edition of Fifth Circuit's Pattern Jury Instructions, but he also previously advocated for use of the pattern instruction for section 1347 health care fraud offenses in the 2019 edition of Fifth Circuit's Pattern Jury Instructions when he filed his Proposed Jury Instructions (Doc. 575 at 1-2).  He, therefore, **forfeited or waived** any objection he had to this instruction.

Regardless, unlike the instruction in *Greenlaw*, the jury instruction in this case did not state that "[a] 'specific intent to defraud' means a conscious, knowing intent to deceive *or* cheat someone." *Greenlaw*, 84 F.4th at 350 (emphasis added).  The Fifth Circuit in *Greenlaw* recognized that it has "long embraced the notion that an '[i]ntent to defraud exists if the defendant acts knowingly with the specific intent to deceive for the purpose of causing financial loss to another or bringing about some financial gain to himself'"—which is consistent with the court's instruction in the present case.  *Greenlaw*, 84 F.4th at 352 (citations omitted).  The court in *Greenlaw* also explained that "[t]his statement is often construed alongside, and read as consistent with, the understanding that '[n]ot only must a defendant intend to defraud or deceive, but he must intend for some harm to result from the deceit.'"  *Id.* (citations omitted).  Thus, there is no reason for the court to conclude otherwise here.

Even if the court's instruction could be construed as allowing jurors to base their decision on a finding of "knowing intent to deceive *or* cheat someone," the evidence in this case was sufficient to satisfy both requirements—knowing intent to deceive *and* cheat someone. Consequently, Defendant Taba has failed to demonstrate that the result would have been different

had the jury been instructed as he now contends for the first time. In other words, he has not shown that the instruction provided to the jury adversely affected his substantial rights as required for relief under Rule 33. Moreover, setting aside the jury's guilty verdict would not be appropriate or serve the interests of justice under the circumstances, as his evidence and related arguments during the trial regarding loans and his involvement, or lack thereof in the health care fraud scheme, were simply not credible in light of the overwhelming evidence to the contrary presented by the Government.

### b. Lack of Good Faith Jury Instruction

Defendant Taba next argues that he is entitled to a new trial because of the court's refusal to include his proposed jury instruction on good faith. He asserts that he attempted during the trial to show good faith by:

> demonstrating that he wrote prescriptions consistent with the standards of medical practice generally recognized or accepted and for patients under his care; that he obtained loans from Ashraf Mofid and Leyla Nourian for the legitimate and legal purpose of settling a civil lawsuit; and that he did not have other cash available to pay that settlement and related attorney's fees because his liquidity was pledged as collateral to secure the appeal bond.

Doc. 860 at 7. Defendant Taba acknowledges that the Fifth Circuit has held that the omission of a good faith instruction is not an abuse of discretion if the defendant was able to present his good faith defense to the jury through other means, such as through witnesses, closing arguments, and other jury instructions. Doc. 860 at 6 (citing *United States v. Toure*, 965 F.3d at 403 (citation omitted). He contends, though, that the court's rulings—that he "could not admit certain exhibits (*e.g.*, Taba 13, 84), call certain witnesses (patient O.P.), elicit any evidence concerning the dismissal of charges against [Sherri] Mofid or L[eyla] Nourian (Section IV, *infra*), or make certain arguments during closing (*e.g.*, that his assets were restrained as collateral for an appeal bond)"— prevented him from presenting his good faith defense. Thus, according to Defendant Taba, the

combination of these rulings, together with the denial of his request for a good faith jury instruction, warrants a new trial.

A court's refusal to give a defendant's proposed jury instruction is reversible error only when: "(1) the instruction sought is 'substantially correct'; (2) 'the requested issue is not substantially covered in the charge'; and (3) 'the instruction concerns an important point in the trial' such that its absence 'seriously impaired the defendant's ability to effectively present a given defense.'" *Toure*, 965 F.3d at 402-03 (citation omitted).

Defendant Taba included the following in his Proposed Jury Instructions:

GOOD FAITH

The good faith of Dr. Taba is a complete defense to the charges of the indictment because good faith is, simply, inconsistent with the intent to defraud alleged in counts 1 and 7-9.

A person who acts or causes another person to act, on a belief or an opinion honestly held is not punishable under this statute merely because the belief or opinion turns out to be inaccurate, incorrect or wrong.

An honest mistake in judgment or error in management does not rise to the level of intent to defraud.

A defendant does not act in "good faith" if, even though he honestly holds a certain opinion or belief, that defendant also knowingly makes material false or fraudulent representations to others.

While the term "good faith" has no precise definition, it means, among other things, a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage of another.

The burden of proving good faith does not rest with the defendant because the defendant does not have any obligation to prove anything in this case.

In determining whether or not the government has proven beyond a reasonable doubt that the defendant acted with an intent to obtain money or property by means of false or fraudulent pretenses, representations, or promises, or whether the defendant acted in good faith, the jury must consider all of the evidence in the case bearing on the defendant's state of mind.

It is also not a defense to charges of health care fraud that the victim may have been gullible or negligent. The laws against fraud are designed to protect the naïve and careless as well as the experienced and careful. While good faith is a defense to health care fraud, an honest belief in the ultimate success of the enterprise is not, in itself, a defense.

Doc. 575 at 3.

No mention of this instruction or objection to the lack of a good faith instruction in the court's charge was asserted, however, by Defendant Taba during the charge conference. He, therefore, **forfeited or waived** the argument that the lack of a good faith instruction in the court's charge to the jury entitles him to a new trial under Rule 33. As the Fifth Circuit has explained, proposed jury instructions are not enough to preserve error absent a request that they be given or an objection to their exclusion in the charge conference. *United States v. Pierre*, 88 F.4th 574, 579 n.2 (5th Cir. 2023) (citing *United States v. Green*, 47 F.4th 279, 294 (5th Cir. 2022)). Moreover, the omission of a good faith instruction is not fatal when the jury is given a detailed instruction on specific intent, and the defendant has the opportunity to present his or her good faith defense to the jury via witness testimony, closing arguments, and other instructions. *United States v. Ary-Berry*, 424 F. App'x 347, 351 (5th Cir. 2011) (quoting *United States v. Storm*, 36 F.3d 1289, 1294 (5th Cir. 1994)) (other citations omitted); *United States v. Frame*, 236 F. App'x 15, 18 & n.5 (5th Cir. 2007).

Here, the court's instructions defining "specific intent," "knowingly," and "willingly" are the same as that in *United States v. Frame*. The Fifth Circuit in that case concluded that such instructions "make plain that the jury was required to acquit *Frame* if, because of his good faith, he lacked specific intent. *Id.* at 18; *see also United States v. Frame*, 4:04-CR-491 (Doc. 99 at 12-14). In cross examining Government witnesses and his closing argument, Defendant Taba was able to advance his defense that he did not have the requisite intent to commit the offenses charges. He did this by developing his defense that the payments he received were loans rather than illegal

kickbacks for his participation in the health care fraud scheme. Defendant Taba's closing argument (Doc. 821 at 148-185) was devoted almost entirely to his good faith defense with his counsel arguing that the payments were loans that he repaid. Defendant Taba's attorney noted the timing of the payments to support the notion that the money paid was not DOL money; he asserted that the Government had not proved that the loans were sham loans, arguing: "[Y]ou don't pay back a kickback" (*Id.* at 151); and he argued about the significance of the supersedeas bond in the civil action.

Defendant Taba's attorney also argued at length about how his client was a "wonderful doctor" who was "beloved" by his patients (*Id.* at 149, 154); that the compound creams alleviated some of his patient's pain; and that Defendant Taba's signature on prescriptions was forged.  *Id.* at 175.  While his counsel did not mention the words "good faith" in his closing argument, his remarks put the defense of good faith and innocent motive before the jury. *See Frame*, 236 F. App'x at 18 & n.5 (quoting *United States v. St. Gelais*, 952 F.2d 90, 93-94 (5th Cir. 1992), for the conclusion that the court's charge adequately conveyed the concept of good faith despite counsel not mentioning the words "good faith" in closing arguments).  Thus, for all of these reasons, Defendant Taba was able to present his "good faith" defense to the jury even though no "good faith" instruction was included in the Court's Instructions to the Jury.

Defendant Taba's contentions regarding his inability to present certain evidence to the jury does not change this.  He asserts without elaborating that the court's rulings prevented him from presenting Exhibits 13 and 84, but the basis for this argument and the relevance of this evidence to his good faith defense is unclear. According to his Exhibit List (Doc. 578), Exhibit 13 was the medical chart for Patient JA, and Exhibit 84 was simply "reserved."  Defendant Taba's Amended Exhibit List (Doc. 581) identifies Exhibit 84 as "Check #8659 in the amount of $50,000 from Dr. Taba to Sherri Mofid on June 1, 2016."  This evidence was not excluded for evidentiary reasons;

rather, Defendant Taba's Amended Exhibit List was stricken in its entirety because it was filed untimely without good cause. While Defendant Taba contends that he was not allowed to call certain witnesses, he only mentions Patient OP. The court, however, was unable to find any reference to Patient OP in any witness list filed by Defendant Taba. Regardless, as indicated, he was able to develop his good faith defense during the trial to the extent it was premised on loan payments and patient care.

Defendant Taba correctly notes that the court would not allow him to argue or elicit evidence concerning the Government's dismissal of the charges against Sherri Mofid and Leyla Nourian. He contends that the Government's dismissal of the charges against these persons is "strong evidence" that they did not commit a crime. He further contends that, because the allegations in the Superseding Indictment against him focused in large part on his interactions with Sherri Mofid and Leyla Nourian, the dismissal of the charges against them is also "powerful evidence as a statement from [the Government] pursuing [his] conviction at trial." Doc. 860 at 17. According to Defendant Taba, "[t]he jury was entitled to know of these inconsistent and contradictory actions as part of its role in assessing the credibility of the parties, their claims, and their evidence." *Id.*

This argument by Defendant Taba regarding the Government's decision to dismiss the charges against Sherri Mofid and Leyla Nourian has absolutely no relevance to his good faith defense regarding his state of mind or intent, *or any other issue in the case*.[4] Further, this argument is based on speculation that the charges against Sherri Mofid and Leyla Nourian were dismissed because they did not engage in illegal conduct. We do not know why the Government decided to

---

[4] Defendant Taba's argument regarding the exclusion of evidence related to the dismissal of charges against Sherri Mofid and Leyla Nourian does not appear to be limited to his good faith defense, as he urges a similar argument as a separate ground entitling him to a new trial.

drop the charges against these persons.  In ruling on the Defendant Taba's Motion in Limine on this issue, the court explained that matters such as this and the voluntariness of Defendant Taba's interview with federal agents were not permissible matters for the jury to decide and would only serve to improperly influence the jury by gaining their sympathy or confusing them into believing that these are proper defenses for them to consider:

> **Defendant Taba must not reference or allude** to any of the matters pertaining to the Government's dismissal of the charges against Ashraf Mofid and Leyla Nourian, the reasons for its decision to dismiss the charges against these persons, or his belief that the Government's theory of the case is flawed as a result of the dismissal of the charges against these persons. Any probative value of such evidence or the legality of the agents' interview of Defendant Taba would be substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [and] misleading the jury[.]" Fed. R. Evid. 403. Moreover, the time for moving to dismiss the charges in the Superseding Indictment on this ground, a legal matter for the court to decide, based on the dismissal of the charges against Ashraf Mofid and Leyla Nourian in October 2022, has long since passed.

Doc. 631 at 2.

Likewise, the court granted the Government's Motion in Limine regarding its decision to not charge these or other persons to the extent that it precluded the Trial Defendants from:

> criticizing the Government's decision to charge or not charge a person in the Superseding Indictment, including the type of comparison that Defendant Taba appears to want to make by comparing himself to Ashraf Mofid and Leyla Nourian in light of the Government's decision to dismiss the charges against these two persons. Any suggestion (in the presence of the jury) that Defendant Taba is not guilty for the charged offenses, or it would be unfair to convict him when the charges against Ashraf Mofid and Leyla Nourian were dismissed, would be improper, irrelevant, and confuse jurors, and is, therefore, **precluded**. *See United States v. Thompson*, 253 F.3d 700, 2001 WL 498430, at *16 (5th Cir. 2001). The court recognizes that not charging a person and dismissing the charges against a person are not the same; however, any references to the dismissal of Ashraf Mofid and Leyla Nourian for the purpose argued by Defendant Taba would be inappropriate for the reasons stated.

Doc. 631 at 4-5.  The court went on to explain that this ruling did not preclude the Trial Defendants from presenting evidence that someone else was responsible for the crime or evidence regarding the credibility or potential bias of a witness who received or expected to receive a benefit for their

cooperation, as evidence that the Government charged the wrong (innocent person) for a crime differed from evidence or argument regarding the perceived unfairness of some persons being charged or receiving reduced sentences for their participation in the same crime or another crime that could lead to an improper verdict based on jury nullification. *Id.* at 5. The court also explained that, if opposing counsel "opened the door" to previously excluded evidence or evidence is developed that supports a prior argument regarding the exclusion or admission of evidence, the party seeking to admit the evidence could approach the bench, ask the court to reconsider its prior ruling, and obtain a ruling from the court. *Id.* at 10.

In addition, Defendant Taba contends that this ruling by the court regarding the admissibility of evidence of the Government's decision to dismiss the charges against Sherri Mofid and Leyla Nourian prevented him from eliciting evidence concerning the conduct of Sherri Mofid and Leyla Nourian (as it related to him) that would have supported his defense that he entered a legitimate promissory note with them. It is unclear why Defendant Taba believes that the dismissal of the charges against these persons is relevant to his defense that the payments he received were loans rather than illegal kickbacks for his participation in the health care fraud scheme; nor is it clear how the Government's decision to dismiss the charges against these persons prevented Defendant Taba from developing his defense that he received loans from either of these persons. He could have, but he did not include Sherri Mofid or Leyla Nourian on his witness list. In any event, as explained, he was able to develop and present to the jury his loan payment defense through other means. Accordingly, Defendant Tabas is not entitled to a new trial on these grounds.

## 2. Three-Week Recess, Severance of James Noryian, and Denial of Mistrial

Defendant Taba next argues that he was prejudiced by the severance of James Noryian, the three-week recess prior to his severance, and the court's denial of his request for a mistrial because the trial was "substantially longer than promised," the severance occurred after the Government

had almost completed its case-in-chief, and the delay during the recess affected jury recall, which caused jurors to have to rely heavily on their notes. Doc. 860 at 8. He asserts that "[t]here is scant case law addressing the precise issue of length of trial and mid-trial delays." Doc. 860 at 8. He, nevertheless, contends that, "[i]n cases tried to a jury, delays and interruptions can rise to the level of reversible prejudice." *Id.* (citing *National Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592, 605 (11th Cir. 1986) (citing *Young & Simon, Inc. v. Merritt Savings & Loan, Inc.*, 672 F.2d 401, 402 (4th Cir. 1982)).

According to Defendant Taba, the facts of this case "present an unusual confluence of events":

> a trial about a complicated but often dull topic expected to last five-to-six weeks that was slowed first by delays related to evidentiary disputes resulting in half and missed days for the jury, then brought to a standstill by J. Noryian's illness for three weeks. By the time the court recessed on October 12, 2023—more than a month after jury selection began, the jury heard only 11-and-a-half days of testimony. The recess spanned a full three weeks before resuming after noon on November 3 for a half day. November 6 and 7 were also partial days for the jury due to Rule 29 motions. Testimony concluded on November 8, the jury heard closing arguments on November 14, and began deliberating on November 15, returning a verdict on November 16. At bottom, it took the jury eight weeks to hear—at best—15 days of testimony.

Doc. 860 at 9.

Defendant Taba correctly notes that the parties raised a large number of hotly contested evidentiary objections that were time consuming to resolve.[5] As explained in the court's memorandum opinion and order denying Defendants' Motion for Severance (of Defendant Taba)—which Defendant Taba joined **only** after consideration of the Motion filed by Defendants Rydberg, Noryian, and Nourian—Defendant Taba's trial counsel was the source of a good deal of

---

[5] The issues raised by the Trial Defendants took a substantial amount of the court's time. If, however, the court had not taken the time to resolve them, Defendant Taba and the other Trial Defendants would be complaining that the court declined or refused to rule on issues raised by them, or that it failed to give them due consideration.

these objections and the evidentiary issues that arose early in the trial regarding antagonistic defenses. *See* Doc. 646. The court, however, disagrees that these or other breaks in the trial affected the jury's ability to recall and consider the evidence in this case and render a fair and just verdict. As with every trial, the court in this case explained to prospective jurors during voir dire that a real trial differs from trials depicted in movies and television where the result and outcome are always known and predetermined. Doc. 796 at 15-16. The court also explained that, unlike trials depicted in movies and television where the judge has a quick answer to objections or the attorneys have quick responses to objections, it is not that simple in real trials and especially not in complex trials like this one. *Id.* Thus, prospective jurors were aware that it would take longer in this trial for attorney objections to be resolved, and their expectations in this regard were managed accordingly before the trial commenced. *Id.*

The court also disagrees that the facts of this case with respect to the length of the trial, the severance of James Noryian, or the court's denial of Defendant Taba's request for a mistrial warranted a mistrial. The court's statement to the jury panel during voir dire that the trial of this case would take "probably five to six weeks" hardly qualifies as a "promise" by the court regarding the length of the trial. While Defendant Taba notes that many prospective jurors expressed concern about the length of the trial and the impact it would have on their job and earnings, this is common in every trial regardless of length. There are always going to be persons who verbalize any number of excuses to avoid jury service, and the court's job is to determine whether any of these excuses is credible and would likely affect the person's ability to focus, listen to all the evidence, and follow the court's instructions regarding the law. Additionally, to accommodate the parties and persons selected to serve on the jury, the court advised prospective jurors that there would be no trial on Mondays to give everyone a break, so they could work on that day or attend to other personal matters. *Id.* at 21. This was also done to allow the attorneys a day each week to attend to

matters accumulating at their respective offices and assess trial strategy. Counsel for no party objected to the undersigned not holding court on Mondays. Moreover, in any trial that is expected to last three weeks or more, the court for the past 26 years has also allowed the parties and jury to take off on either Monday or Friday.

Defendant Taba next argues that the court's refusal to grant him a mistrial required him "to proceed with a jury that **_likely could not recall_** the evidence and was forced to rely on their notes," but this is based on nothing more than rank speculation, as there is no indication that this was actually the case here.  Doc. 860 at 12 (emphasis added).  None of the jurors expressed concern about being able to remember the evidence presented before the break, and every juror was polled and confirmed that the verdict was his or hers.  In the past, the court has discouraged too much reliance on note-taking, particularly if doing so would distract a juror's attention and cause him or her to miss key evidence that was being presented; however, there is nothing wrong with jurors referring to their notes, and there is no evidence that the jury here was "forced to rely" solely on their notes to recall evidence presented earlier in the case. Further, the Court's Instructions to the Jury made clear that jurors were not to rely solely on their notes: "Any notes that you have taken during this trial are only aids to your memory. If your memory differs from your notes, you are to rely on your memory and not your notes." Doc. 723 at 13. Additionally, contrary to Defendant Taba's argument, the jurors' questions to the court during deliberations suggest that they were fully engaged in the process and serious about fulfilling their roles and duties as jurors despite the length of the trial, and the breaks taken during the trial.  *See* Doc. 724.

Defendant Taba notes that the court denied his request to poll jurors regarding their recollection of the evidence.  The court also disagreed that the delays as of the time it severed James Noryian required a mistrial because the facts during this trial differed from those during the first trial when the court declared a mistrial.  As the court explained in its memorandum opinion

and order addressing these issues, during the first trial there was a long gap of 32 days, whereas in the second trial, there were only occasional and intermittent delays in between evidence and testimony before the issue with James Noryian's medical condition arose, and the consecutive amount of delay in days this time was much less than last time.  Doc. 704 at 19-20.

The court recognized that there was a potential risk of jurors being unable to remember evidence if the trial was further delayed, but it also noted that it had to balance this with the risk of losing jurors if the delays in trial continued. *Id.* The court determined that these factors weighed in favor of resuming the trial as soon as possible rather than awaiting the results of James Noryian's evaluation as urged by the parties or declaring a mistrial as to all Defendants.  *Id.* at 20.  As explained by the court, defendants on bond generally do not have the same incentive to go to trial as defendants who are in custody pending trial, but at some point, this litigation, which had been pending since 2017, had to come to a conclusion because there was a substantial risk that, with the continued passage of time, witnesses would become unavailable, and their memories would fade, resulting in the loss of evidence. *Id.* The court noted that this had already occurred and resulted in one Government witness being unable to testify in person at trial.  The court also agreed with the Government that, at some point, "justice delayed is justice denied" and forcing the Government to retry this case a third time at taxpayer expense "would result in undue prejudice and a denial of an efficient and just resolution of this matter, to which the government and the public are entitled." *Id.* (citations omitted).

Finally, the court determined that, given the late stage of the proceeding in the current trial with the Government about to conclude its case-in-chief, it did not make sense to declare a mistrial or delay the trial pending James Noryian's evaluation because it was unclear whether he would even be able to participate at a later date. As noted earlier, as of this date, no new date has been set to try James Noryian, which further validates the court's concern and justification for granting the

severance rather that granting a mistrial. Thus, the court determined that the foregoing concerns pertaining to judicial economy and prejudice to the Government and witnesses were not outweighed by the alleged prejudice articulated by Defendants Taba, Rydberg, and Nourian, which consisted of only generalized assertions of prejudice if the trial were to proceed without James Noryian. This was particularly so given that all were charged with conspiracies and all evidence against James Noryian would have been admissible against them, and Defendants Taba, Rydberg, and Nourian had not convinced the court that James Noryian's presence or absence would prevent the remaining Trial Defendants from putting on a vigorous defense.  Regardless of the delays caused by James Noryian's medical condition or other matters, the cases cited in the Government's response establish that resuming trial after a delay of three to four weeks is not uncommon in this or other circuits.  *See* Doc. 876 at 17 (citing cases in which delays in trial range from two weeks to 32 days).

Moreover, because the break in the trial occurred after the Government had almost finished presenting its case, the evidence presented by the Trial Defendants, including Defendant Taba, was fresher in the jurors' memories, and there is no indication that Defendant Taba's counsel was unable to sufficiently recall the Government's evidence for purposes of effectively arguing against such evidence during his closing argument.  In addition, as Defendant Taba's counsel is aware, all of the parties requested and received daily transcripts of the trial testimony, and these transcripts were available to all parties for use in questioning or recalling prior witness testimony.  It is true that there was a lot of evidence to cover during closing arguments but, as Defendant Taba points out, the parties requested and were given more time than usual to make their respective closing arguments, so they had the opportunity to thoroughly cover the evidence—or the lack thereof—and highlight how this supported their theories of the case before the jurors deliberated.  In any

event, there is always a risk that jurors might forget some details in lengthy, complex cases that are long in length.

Brief delays during the trial in the form of "half" or "missed days" because of evidentiary disputes that the court needed to resolve outside the presence of the jury contributed to the length of the trial, but such delays are insufficient to establish the type of prejudice requiring a new trial. If delays caused by evidentiary disputes were enough to warrant a new trial, the Government or a defendant could always obtain a new trial by raising extensive evidentiary issues or objections. Similarly, if a new trial was warranted in every criminal case that was considered "dull," then courts would be retrying numerous cases. This, however, is not the law, and the legal authority relied on by Defendant Taba (opinions in Eleventh and Fourth Circuit civil cases) is not binding on the court.

Despite Defendant Taba's criticism, the court did its job in taking time to rule on evidentiary matters raised by him and his Codefendants. Their actions necessarily caused delay, but for Defendant Taba or the other Trial Defendants to use this as a weapon to argue that these delays caused any of them undue prejudice goes "beyond the pale." Simply put, it is astonishingly ironic for Defendant Taba or any other Defendant to assert that trial delays prompted by issues that **they** raised caused them undue prejudice. The court cannot apprehend the glaring inconsistency in this argument, which is **rejected** without further comment.

Likewise, regarding the severance of James Noryian because of his medical condition, there is no evidence that Defendant Taba was prejudiced, particularly in light of the court's instruction and the overlapping and relevant evidence regarding the role played by James Noryian in the conspiracy compared to the roles of the remaining Trial Defendants, including Defendant Taba. Moreover, this is not a situation in which the evidence regarding James Noryian's conduct was only tangentially relevant to Defendant Taba's involvement in the health care fraud scheme;

rather, it was intertwined. Additionally, each Defendant had the opportunity to cross examine the Government's witnesses who testified regarding James Noryian's conduct, and they all pointed to James Noryian during opening statements. They also repeatedly and physically pointed to his "empty chair" during closing arguments in an attempt to lay all of the blame at his feet.

Finally, Defendant Taba argues that James Noryian's presence at the beginning of trial affected his ability to fully defend himself. According to Defendant Taba, James Noryian's counsel allegedly made a statement to his counsel before the trial that "good things" would "happen in the first five to ten days." Doc. 860 at 15. Because of this statement, Defendant Taba asserts that his attorney decided not to accuse James Noryian or anyone of forging his signature without his authorization and instead simply stated during his opening statement that the signatures on the prescriptions were not his client's and did not match. He, therefore, argues that James Noryian's presence at the start of the trial "clearly impacted [his] trial strategy to his detriment." *Id.* at 16. Defendant Taba further asserts that:

> [James] Noryian expressed his desire and indicated his intent to testify at this trial. But upon granting the severance, Noryian was no longer a defendant on trial and he was unavailable to testify (because of his medical condition, and legally, as a defendant who had not yet been tried, he had a Fifth Amendment privilege against doing so if subpoenaed).

*Id.*

The argument by Defendant Taba's current post-trial counsel regarding the chosen legal strategy of the attorneys who represented him during the trial is insufficient to demonstrate that the mid-trial severance of James Noryian prejudiced him, as his current counsel does not explain how the result would likely have been any different if the court had not severed James Noryian. Further, it is unclear why Defendant Taba believes that James Noryian intended to testify during the trial, as his name was not on his or anyone else's witness list. The court also agrees with the Government that, even if James Noryian had not been severed and had chosen to testify, it is highly

unlikely he would have agreed to waive his Fifth Amendment right against self-incrimination to testify on behalf of Defendant Taba. Further, Defendant Taba's trial counsel previously acknowledged that, even if not severed, James Noryian could change his mind and exercise his right not to testify. *See* Doc. 704 at 17-18, 22. Accordingly, Defendant Tabas is not entitled to a new trial on this ground.

### 3. Evidentiary Rulings

Finally, Defendant Taba contends that he is entitled to a new trial because of certain evidentiary rulings. Specifically, he argues that he is entitled to a new trial because hearsay admitted in connection with Marjaneh Hedayat's and Robbie Jossa's testimony and Government Exhibit 716, and the confusion caused by Dr. Elliott Cook's testimony regarding claims data constitutes "obvious error" and the Government's "best evidence" against him that "affected the fairness of the proceedings." Doc. 860 at 18. Defendant Taba asserts that this evidence "should not have been admitted, but when it was, it should have been accompanied by an instruction limiting its use against J. Noryian[] only, and . . . it should have been stricken altogether once Noryian was severed." *Id.* at 18-19. For support, Defendant Taba argues that, in *United States v. Tarango*, 396 F.3d at 674, the Fifth Circuit affirmed the district court's grant of a new trial and cited with approval *United States v. Davidson*, 936 F.2d 856, 861 (6th Cir. 1991), in which the Sixth Circuit determined that a new trial was warranted because the Government's introduction of evidence that was probative with respect to an absent codefendant was inadmissible and prejudicial to the defendant who remained present throughout the trial. Defendant Taba argues that these "evidentiary errors so infected [his] trial" that "the interests of justice require a new one." *Id.* at 19 (citing Fed. R. Crim. P. 33(a)). The court addresses each of his arguments in turn.

### a. Testimony of Marjaneh Hedayat

Regarding Marjaneh Hedayat, Defendant Taba contends the following testimony by her

constitutes hearsay concerning statements that James Noryian made to her.

**Q.** (By Mr. Emokpae) Did James Noryian ever mention Dr. Taba to you?

**A.** Yes.

**Q.** What, if anything, did James Noryian tell you about Dr. Taba's knowledge about
the system?

**A.** I just know that he, Dr. Taba—he said Dr. Taba was prescribing his
prescriptions, his medications, compounded medications.

**Q.** Did James Noryian ever tell you whether or not he paid kickbacks to Dr. Taba?

**MR. OSSO:** Objection, leading.

**THE COURT:** He said, "whether or not," so that gives the witness a choice. The
objection is overruled.

**A.** Yes.

**Q.** (By Mr. Emokpae) What did he say?

**A.** We were at a dinner, and he said that he had helped Dr. Taba put his house in an
LLC so that he will not lose it in case something happened. And then he pulled out
an envelope, a white envelope from his back pocket, opened it, and it was hundred-
dollar bills. And he said, "This is $5,000." And he said I'm going to see him after
our dinner so I can give this to him and thank him for helping me with my
pharmacy.

Doc. 860 at 19 (quoting Tr. Vol. 10B, 26-27 (Oct. 5, 2023)).

Defendant Taba acknowledges that he failed to object to this line of questioning based on

hearsay or any other grounds, but he nevertheless contends that it is reversible error because it

does not fall within Federal Rule of Evidence 801(d)(2)(e)'s hearsay exception[6] for a statement

---

[6] Rule 801(d)(2)(E) provides that a statement offered against an opposing party and made by the party's coconspirator
during and in furtherance of the conspiracy is not hearsay.

made among coconspirators in furtherance of the conspiracy, and the exception prejudiced him, as this was the Government's sole evidence "about a cash payment to [him]." Doc. 860 at 21.

Unlike *Tarango*, this is not a situation in which the trial evidence "preponderates sufficiently heavily against the verdict such that a miscarriage of justice may have occurred." *Tarango*, 396 F.3d at 672 (internal quotation marks and citations omitted). To the contrary, there was more than sufficient direct and circumstantial evidence supporting the jury's guilty verdict for the charges against Defendant Taba, and Marjaneh Hedayat's testimony was not the only evidence that he was paid for his participation in the health care fraud scheme. Kevin Williams and Robbie Jossa testified regarding the nature of James Noryian's agreement with Defendant Taba, and there was also evidence that he was paid substantial sums via cashier's checks to conceal the nature of the payments made to him for prescribing millions of dollars of medically unnecessary compound creams. Thus, even assuming as Defendant Taba contends that the foregoing testimony by Marjaneh Hedayat constituted inadmissible hearsay,[7] which contention is disputed by the Government, the court determines that this evidence is insufficient to establish the type of prejudice required for a new trial.

### b. Testimony of Robbie Jossa

Defendant Taba next contends that the court similarly erred in admitting the following testimony by Robbie Jossa, a marketer for Ability Pharmacy, who testified regarding his communications with James Noryian. According to Defendant Taba, the following exchange reflects Mr. Jossa's testimony in response to "[t]he prosecutor ask[ing] [him] to recount what

---

[7] Federal Rule of Evidence 801 defines hearsay as a "statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."

[James] Noryian told him about Ability and doctors who treated DOL workers' compensation patients" and what Defendant Taba said outside of his presence during a meeting at Starbucks:

> **Q.** Okay, now, you had mentioned DOL doctors who treat workers' compensation patients. Were there specific doctors that James Noryian told you he targeted?
>
> **A.** It was Dr. Benson and Dr. Taba, and then later Dr. Williams.
>
> . . . .
>
> **Q.** Did [James Noryian] tell you anything about that meeting—about that separate meeting with Dr. Taba, yes or no?
>
> **A.** Yes.
>
> **Q.** What did he say?
>
> **A.** He said Dr. Taba asked him if I could be trusted. . . .

Doc. 860 at 21-22 (citing Tr. Vol. 4A, 22-32 (Sept. 22, 2023)). Defendant Taba argues that this testimony by Mr. Jossa constitutes hearsay that does not fall within the coconspirator statement exception because the statements referenced were not made in furtherance of the conspiracy, and Mr. Jossa testified that he was not involved in the conspiracy. Defendant Taba contends that he was prejudiced by the admission of this testimony because the Government relied heavily on it in its closing argument.

Questions such as this do not qualify as hearsay under Rule 801(a) because they are not assertions or statements under Rule 801(a). *See, e.g.*, *United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990). Moreover, as the Government correctly notes, Defendant Taba's question to James Noryian, inquiring whether Mr. Jossa could be trusted, was not offered for the truth of the matter asserted. Instead, it was offered as circumstantial evidence regarding Defendant Taba's guilty state of mind. If Defendant Taba believed that he was engaging in lawful conduct, he would have had no reason to be concerned about whether Mr. Jossa could be trusted. Likewise, the testimony elicited by the Government from Mr. Jossa that James Noryian targeted Dr. Benson and Dr. Taba,

and then later Dr. Williams was offered to establish James Noryian's state of mind and explain why he entered agreements with these doctors to send prescriptions to the pharmacies. Thus, the foregoing testimony of Mr. Jossa is not hearsay, and Defendant Taba is not entitled to a new trial on this ground.

### c. Government Exhibit 716 and Related Testimony

Defendant Taba argues that Government Exhibit 716—an e-mail between his employee Megan Marines at Advanced Orthopedics and Ability Pharmacy employee Melissa Driver—was not properly authenticated and does not qualify as a business record of Ability Pharmacy as required for its admission under Federal Rule of Evidence 803(6).[8] In the e-mail, Ms. Driver states in pertinent part: "James [Noryian] said that Dr[.] Taba told him last night there were some new patients that had surgery and he was going to send in new RX. James is asking if we got them, do you know anything about this?" Gov't Ex. 716. Ms. Marines responds: "I just received everything from [T]aba. I'll send to you soon." *Id.*

In addition, he contends that, contrary to the Government's assertion at trial, this e-mail is not admissible under Rule 801(d)(2)(D) as nonhearsay because Mses. Marines and Driver were employed by Ability Pharmacy and Advanced Orthopedics, respectively, which are not parties to this case. Defendant Taba, therefore, contends that Mses. Marines and Driver do not qualify as party opponents or agents of party opponents.

---

[8] Under Rule 803(6), business records or records of regularly conducted activity are an exception to the hearsay rule if:

> (A) the record was made at or near the time by--or from information transmitted by—someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Defendant Taba further contends that the following testimony by Ms. Marines makes clear that Government Exhibit 716 was offered for the truth of the matter asserted, as there would have been no other reason for the Government to inquire:

**[Q.]** So was it uncommon for James to ask you—well, why did you reach out to Melissa at Dr. Taba's office?

**A.** Because James had said that we were supposed to receive some prescriptions, and we hadn't yet.

**Q.** Okay. And—and who did you say had told—had told James that?

**A.** James said that Dr. Taba told him he was going to send more.

Doc. 860 at 27 (quoting Tr. Vol. 4B, 135 (Sept. 22, 2023)).

Rule 801(d)(2)(D) provides that a statement is not hearsay if the "statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  Although the rule does not define "agent," the court in *United States v. Saks*, 964 F.2d 1514 (5th Cir. 1992), concluded that "Congress intended to refer to general common law principles of agency when it used the term," and like other courts, it declined to construe the agency relationship required for Rule 801 in a "hyper-technical" manner. *Id.* at 1524.

Sufficient evidence was presented at trial establishing the employee or agency relationship between these women and Defendants Taba and Noryian, and the court determines that Defendant Taba's argument that Rule 801(d)(2)(D) does not apply because they were only agents or employees of Defendant Taba's and Defendant Noryian's businesses is the type of "hyper-technical" application not intended by Congress. *See Saks*, 964 F.2d at 1524.  Consequently, the e-mail and statements made within it by Mses. Drivers and Marines do not qualify as hearsay, and Defendant Taba is not entitled to a new trial on this ground.

### d. Testimony of Elliott Cook Regarding Claims Data

Finally, Defendant Taba asserts that the testimony of Government witness Dr. Elliott Cook regarding the claims data inflated the amount of the claims submitted to the DOL, and was, therefore, misleading and prejudicial. He further asserts that the court's instruction and the exclusion of certain Government exhibits did not cure the misleading nature of his testimony because there were other exhibits not stricken that included duplicate submissions of claims.

The Government counters that, contrary to Defendant Taba's suggestion, the court did not find that the claims data itself was unreliable; it instead expressed concern regarding certain summary charts prepared by the Government regarding the claims data, but these were withdrawn by the Government. On the other hand, the Government argues that the "DOL claims data admitted at trial as GX 212, 214, 215, and 217 accurately reflected the claims submitted (and, at times, denied and resubmitted) and metrics such as ingredient costs" and this is "why it remained in evidence." Doc. 876 at 38-39. According to the Government, "the impact of all of this was mooted" because it "proceeded to admit boxes of thousands of prescriptions" that Defendant Taba "sent to the pharmacies for the compounded drugs at issue (GX 301-03)," as well as "the remittance vouchers that detailed the thousands of prescriptions that the pharmacies billed to the DOL for [his] prescriptions." *Id.* at 39. With respect to Defendant Taba's argument regarding the accuracy of the claims data concerning two of his patients in Counts 8 and 9 of the Superseding Indictment, the Government contends that this goes to the weight of the evidence, and, contrary to Defendant Taba, Dr. Cook did not testify regarding prescriptions numbers but instead testified regarding prescriptions based on the "TCN" because prescriptions can be refilled using the same prescription number and, therefore, used multiple times on different dates and billed to the DOL.

The court verbally instructed jurors during the trial not to consider withdrawn Government Exhibits 418, 421, 1001, 1034, and 1035; and any testimony by Dr. Cook regarding these exhibits.

This instruction was repeated in Court's Instructions to the Jury, which similarly informed jurors that Government Exhibits 418, 421, and 1001 were withdrawn and not in evidence because the billed amounts in these exhibits included claims that were denied and resubmitted. The court also informed the jury that Government Exhibits 1034 and 1035 had been withdrawn, and jurors were not to consider any withdrawn exhibits, the information contained in the withdrawn exhibits, or Dr. Elliott Cook's testimony regarding these withdrawn exhibits. Doc. 723 at 10-11. Contrary to Defendant Taba's assertion, the court determines that this specific limiting instruction prevented any potential prejudice and confusion, and he has not shown that the claims data evidence that was not withdrawn contained errors of such magnitude that would warrant a new trial. Further, Defendant Taba did not object during the trial to the admission of the Government's exhibits that included the underlying claims data, so any argument by him now regarding these exhibits is **forfeited or waived**.

## IV.    Conclusion

The evidence of Defendant Taba's guilt with respect to each offense for which he was convicted was significant. That he may disagree with the Government's portrayal of evidence, the jurors' assessment of that evidence, the inferences drawn by jurors from the evidence in deliberating, or the jurors' weighing and deciding the credibility of witnesses is of no moment given the Court's Instructions to the Jury. Further, he has not shown the type of exceptional circumstances or miscarriage of justice necessary to warrant a new trial. Simply put, this is not a situation in which the jury's guilty verdict or Defendant Taba's conviction for the charged offenses is only "tangentially" supported by the evidence; rather, as indicated, the evidence of his guilt was overwhelming in the court's view and apparently the jury similarly concluded. Accordingly, for these reasons and the other reasons explained, the court **denies** Defendant "Michael Taba's Motion for a Judgment of Acquittal (R. 29) and Motion [for] New Trial (R. 33)" (Doc. 860).

**It is so ordered** this 24th day of February, 2026.

Sam A. Lindsay
United States District Judge